EXHIBIT 2

# CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

AGREEMENT made as of the 26 day of July 2001 between Mark Peterson (herein after referred to as "Employee") and International Sourcing & Marketing, Ltd. A Rhode Island registered company and it's affiliates (Including ISM Asia, Inc., A BVI registered company) (the "Company").

W I T N E S S E T H  T H A T:

WHEREAS, Employee is or will be an Employee of the Company;

WHEREAS, Employee, during the course of his or her term of service to the Company has and/or will obtain confidential information concerning the customers, business practices and financial affairs of the Company; and

WHEREAS, Employee and the Company wish to protect such confidential information;

NOW, THEREFORE, in consideration of the appointment of Employee by the Company and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Restrictions on Competitive Activity.

1.1 Employee acknowledges that (a) the principal business of the Company involves the sourcing or locating of electronics components and providing logistics services (the "Products") from equipment manufacturers or suppliers (the "Suppliers") and selling or reselling the Products to its Customers (the "Customers"); (b) the Company is among a limited number of persons providing such services; (c) Employee's engagement by the Company has provided and will continue to provide him or her with trade secrets and confidential information concerning the customers, business practices and financial affairs of the Company which are not readily available to the public; and (d) the agreements of Employee in this Agreement are essential to protect the business and good will of the Company.

1.2 During the Restriction Period (as defined in Section 1.3), Employee agrees that he or she will not, singly, jointly or as a member, employee, or agent of any partnership or other business entity or person, or as an officer, agent, employee,

director, stockholder (except of not more than one percent (1%) of the outstanding stock of any company listed on a national securities exchange or actively traded in the over-the-counter securities market) or investor of any other corporation, entity or person, or in any other capacity, directly or indirectly, own, manage, operate, join, control or participate in the ownership, management, operation, or control of, or work for (as an employee, consultant, or independent contractor), any person, corporation or entity which is in direct or indirect competition with any business being conducted by the Company at the time of the termination of Employee.

During the Restriction Period, the Employee specifically agrees that he or she will not sell any products similar to the Products or any logistics services to any Customer of the Company or any person or entity who is being quoted as a potential Customer of the Company at the time of termination nor will the Employee during the Restriction Period source or obtain or attempt to obtain directly or indirectly any products similar to the Products of the Company from any Suppliers of the Company as those Suppliers exist at the time of termination.

1.3 The term "Restriction Period" shall mean the period during which Employee is engaged by the Company and an acknowledged period of two (2) years following the termination of such engagement for restricted activities relating to Suppliers and Employees of the Company and nine (9) months for restricted activities relating to Customers of the Company .

1.4 During the Restriction Period, Employee shall not directly or indirectly hire, solicit the employment of, or encourage to leave the employment of the Company or to terminate a consultative or advisory relationship with the Company, any individual who is known to Employee to be an Employee or consultant of or advisor to the Company; and during the Restriction Period, Employee shall not directly or indirectly counsel, advise, induce, encourage or otherwise attempt to influence any customer of the Company, to terminate any commercial or business relationship between such customer and the Company.

2. Secrecy Obligations. Employee will hold in strict confidence, will not use for his or her own account or for the benefit of any person other than the Company, and will not publish or otherwise disclose to persons not under an obligation of secrecy or confidentiality to the Company, no less restrictive than this Section 2, all Information (as defined in Section 4) disclosed or made available to Employee by the Company, except for: Information which (a) is or becomes publicly known or publicly available through no violation of any of

Employee's obligations in this Agreement; (b) is disclosed pursuant to a regulatory requirement or request of a governmental agency or in response to a valid subpoena or the like or an order, judgment or decree of a court of competent jurisdiction; or (c) is in the nature of general knowledge gained by Employee without use or disclosure restrictions prior to his or her initial association with the Company.

3. Use and Return of Materials. At the termination of services, Employee shall return to the Company the original and all copies of correspondence, memoranda, files, records, business forms, price lists, customer order, and other tangible materials that may have been at any time entrusted to Employee or otherwise may have come into his or her possession and which contain or relate to any Information entitled to protection under this Agreement.

4. Definition of Information. The term "Information" shall include, but is not limited to, the whole or any part of:

(a) Concepts, trade secrets, know-how procedures, data, and all other types, forms or varieties of information or so-called intellectual property, whether or not patentable or susceptible to copyright or trademark protection;

(b) Information pertaining or otherwise relating to financial, accounting or tax matters, product or service marketing or sales, business plans, strategies or prospects, resources, Agents and employment, and general commercial information;

(c) Names, addresses, requirements, utilization capabilities, responsible officials and Agents, purchasing policies and practices of and other details pertaining to existing Customers, or to past, existing, or prospective customers of the Company;

(d) Names, addresses, responsible officials and employees, policies or practices or any other data pertaining to Suppliers, other suppliers, vendors and other sources of supplies or services; and

(e) Any and all forms of knowledge or data that in any instance directly or indirectly relates to, is associated with, or is ancillary to

MJP
7/27/01

any past, present or future business or commercial activity of the Company; irrespective of whether any Information is provided by oral or written communication or by providing any documents, instruments, computer programs or computer software, compilations, notes, reports or instructional manuals.

5. Rights and Remedies. If Employee violates or threatens to commit a breach of any of the provisions of this Agreement (the "Restrictive Covenants"), the Company shall have the following rights and remedies, each of which rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to the Company at law or in equity:

(a) The right and remedy to have the Restrictive Covenants specifically enforced by any court having equity jurisdiction and to have Employee's breach or threatened breach of the Restrictive Covenants restrained by temporary restraining order, temporary or permanent injunction, or the like, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the Company and that monetary damages will not provide adequate remedy to the Company, and

(b) The right and remedy to require Employee to account for and pay over to Company all receipts, revenues, compensation, gross profits, accruals, increments and accretions, or other financial or economic benefits derived or received by Employee (or any person acting in concert with Employee or aiding or abetting his conduct) as a result of any transactions constituting a breach of any of the Restrictive Covenants, and Employee shall account for and pay over such benefits to the Company.

6. Severability. If any court of competent jurisdiction:

(a) determines that any of the Restrictive Covenants or any part thereof is invalid or unenforceable, the remainder of the Restrictive Covenants shall not thereby be affected and shall be given full force and effect, without regard to the invalid parts or portions; and

(b) determines that any of the Restrictive Covenants, or any part

thereof, is unenforceable because of the duration or geographic scope of such provision, such court shall have the power to reduce the duration or scope of such provision, as the case may be, and in its reduced form such provision shall then be enforceable and shall be enforced.

7. <u>No Employment Obligation.</u> Nothing contained in this Agreement shall be deemed to constitute an agreement by the Company to employ or continue to employ Employee.

8. <u>Governing Law.</u> This Agreement shall be governed by the laws of Rhode Island and the parties hereto hereby submit to the jurisdiction of the courts of Rhode Island USA.

IN WITNESS WHEREOF, Employee and the Company have executed this Agreement as of the date set forth above.

Mark Peterson
Mark Peterson

111 Hillsdale drive
Gurley AL, 35748
(Address)

Witness: Donna J. Peterson
(Print Name) Donna J. Peterson

International Sourcing & Marketing, Ltd

By: Gregory Lucin
Gregory Lucin
Vice President