UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

INTERNATIONAL SOURCING &
MARKETING, LTD.,

Plaintiff

v. C.A. No. 04-511ML

MARK PETERSON,

Defendant

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR LEAVE TO FILE THIRD AMENDED COUNTERCLAIM**

Plaintiff International Sourcing & Marketing ("ISM") hereby opposes defendant Mark Peterson's motion to file his third-amended counterclaim. Plaintiff opposes said third-amended counterclaim on the sole basis that defendant has taken the position that if he withdraws his emotional distress claims he will not be required to produce his medical records because they are no longer relevant.

Plaintiff states that defendant's medical records are still relevant and relies upon its memorandum of law attached hereto in support of its opposition.

INTERNATIONAL SOURCING &
MARKETING, LTD.,
By its Attorneys,

CATHERINE A. SAMMARTINO (#4762)
DANIELLE R. MENARD (#5821)
Sammartino & Berg LLP
Shakespeare Hall
128 Dorrance Street, Suite 400
Providence, RI 02903
(401) 274-0113 telephone
(401) 274-0175 facsimile

## CERTIFICATION

I hereby certify that on this 12 day of December, 2005, I caused to be submitted via facsimile and regular mail, postage prepaid, a copy of the within Memorandum in Opposition to the following counsel of record:

Armando E. Batastini, Esquire
Stephen J. MacGillivray, Esquire
Edwards & Angell LLP
2800 Financial Plaza
Providence, R.I. 02903

Allen J. Anderson, Esquire
FEES & BURGESS, P.C.
213 Green Street
Huntsville, AL 35801

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

INTERNATIONAL SOURCING &
MARKETING, LTD.,

Plaintiff

v. C.A. No. 04-511ML

MARK PETERSON,

Defendant

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO DEFENDANT'S MOTION FOR LEAVE TO FILE THIRD AMENDED COUNTERCLAIM**

Plaintiff International Sourcing & Marketing ("ISM") hereby submits the following memorandum of law in support of its opposition to defendant's motion for leave to file third amended counterclaim.

**Procedural Background**

The present action was commenced November 21, 2004. Defendant, Mark Peterson ("Peterson") filed his answer and first amended counter-claim on February 14, 2005. Peterson's first amended counter-claim did not contain any allegations of emotional distress. One month later, in March 2005, Peterson filed his second amended counter-claim adding two counts of emotional distress. Peterson was deposed on June 13, 2005.

In his sworn deposition testimony, Peterson testified under oath that ISM caused him severe emotional distress. (Peterson depo. at 68, 70, 74). Peterson also testified he spoke with Mr. Ty Daniels of Rep One, Inc. regarding his mental health. (Peterson depo.

at 120-121). In addition, Peterson testified he had "short-term memory problems" stemming from ISM's "harassment." (Peterson depo. at 67-68).

ISM requested Peterson's medical records in its Second Request for Production of Documents, dated September 22, 2005. Peterson did not produce his medical records. On October 26, 2005, Peterson filed an untimely objection to ISM's request for his medical records, stating that the request was overbroad and that "certain entries in Peterson's medical records have no relevance to this matter." In a letter, dated November 28, 2005, ISM attempted to secure the Peterson's medical records from defense counsel without court intervention. (A copy of letter is attached hereto as Exhibit A). This attempt also was unsuccessful.

On December 1, 2005, ISM deposed Ty Daniels of Rep One, Inc. In direct contrast to Peterson's sworn testimony (Peterson maintained that Mr. Daniels contacted him during the non-competition period to inquire about his well being), Mr. Daniels testified that he had never spoken with Peterson regarding his mental health, and was unaware that Peterson had any emotional issues at all.

Shortly thereafter, on December 5, 2005, Peterson moved to amend his counter-claim for a third time. The proposed third-amended counter-claim seeks to withdraw Peterson's claims of emotional distress.[1]

Peterson takes the position that his medical records are not relevant because he seeks to have his claims of emotional distress withdrawn. ISM has filed its Motion to Compel Production of Defendant's Medical Records concurrent with its opposition to

---

1 Counsel for ISM agreed to stipulate to the withdrawal of Peterson's emotional distress claims, on the condition that Peterson would produce the requested medical records. Peterson's counsel declined on the basis that if the claims were withdrawn, then the records become irrelevant to the litigation.

defendant's motion for leave to amend third counter-claim. ISM requests that this Court order Peterson to produce his medical records and opposes Peterson's Motion for Leave to File his Third Amended Counter-claim on the basis that even if the motion were granted, Peterson's medical records are still relevant to the issues in this case.

## Standard of Review

The scope of discovery is governed generally by Fed. R. Civ. P. 26(b), which reads in pertinent part: "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." FRCP 26(b). It is well established that the range of discovery under this provision is extremely broad. Bennett v. LaPere, 112 F.R.D. 136 (D.R.I. 1986)(Court compelled disclosure of a settlement between plaintiffs and former co-defendants) *citing* Advisory Committee Notes to Rule 26, 1946 Amendment. If there is some legitimate relevance to the requested information and if no cognizable privilege attaches, it ought to be discoverable. Id. "In federal litigation relevance has come to be an elastic concept." Bennett *citing* U.S. v. Tierney, 760 F.2d 382, 387-88 (1st Cir. 1985)(court held evidence of defendant's prior indictment was relevant). "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Bennett *citing* Hickman v. Taylor, 329 U.S. 495, 507, 91. L. Ed. 451, 67 S. Ct. 385 (1947). To that end, Rule 26(b) allows a party to inquire into *anything* "relevant" to the subject matter of the litigation.

**Certainly, whether Peterson has lied regarding his mental health condition and treatment to inflate his damages is relevant to the case. Moreover, Peterson's ability to perceive and remember events has been called into question and must be explored.**

## Argument

Peterson put his medical condition in issue when he claimed he sustained intentional and negligent infliction of emotional distress due to ISM. Accordingly, ISM is entitled to delve into Peterson's medical records to evaluate the truthfulness of and basis for Peterson's emotional distress claims, even if this Court ultimately allows him to withdraw them.

### 1. Peterson's Medical Records are Essential for ISM to Evaluate Peterson's Claimed Memory Loss and His Credibility.

The underlying purpose of the discovery rules is to allow parties to obtain the fullest possible knowledge of the issues and facts before trial. Ricciardi v. Sylvester Sheet Metal Corp., 1995 U.S. Dist. Lexis 5029 (D.N.H. 1995). The First Circuit has stated that a "court should develop the parameters of ... discovery... by carefully weighing the interests involved, balancing the importance of [any] privilege asserted against the defending party's need for the information to construct its most effective defense." Greater Newburyport Clamshell Alliance v. Public Service Co., 838 F.2d 13, 20 (1st Cir. 1988)(Court held attorney-client privilege not absolute and allowed limited questioning of attorney). In weighing both parties' interests, a Court must consider the relevance of the requested information and whether the information will aid in the defense of the case. Id. The legislature certainly did not intend to prevent just resolution of claims by giving the plaintiff the right to deprive the defendant of relevant information. Nelson, 534 A.2d 720.

Peterson's medical records are relevant because he testified in his deposition that he suffers from memory loss. (Peterson depo. at 67). Thus, Peterson has called into question his ability to perceive events accurately and/or to recount those events truthfully

and accurately at a later time. Federal courts have permitted the impeachment of witnesses based on their mental condition at the time of the events testified to: "[e]vidence about a prior condition of mental instability that 'provides some significant help to the jury in its efforts to evaluate the witness's ability to perceive or to recall events or to testify accurately" is relevant." U.S. v. Butt, 955 F.2d 77, 82 (1st Cir. 1992). In addition, Defendant's medical records of his treating physician would include circumstances observed by the physician and first-hand on-scene observation by a witness should be always and equally accessible to both parties. Donovan v. Bowling, 706, A.2d 937, 941 (RI 1998) (Court denied defendant's motion in limine to disqualify treating physician and expert witness for plaintiffs because the physician had previously been contacted by the defendant).

Accordingly, ISM should be entitled to explore exactly when Peterson was on any medication; whether the medication caused his memory loss; and how his memory loss could affect his ability to remember events accurately.

Second, Peterson's medical records are relevant to impeach his credibility. Peterson testified he suffered emotional distress that required him to undergo extensive medical treatment. ISM should be allowed to inquire into whether he did indeed suffer emotional distress and, if he did. If Peterson's medical records do not indicate he suffered or received any treatment, or sought treatment for issues unrelated to his ISM employment, then the records directly speak to his credibility. Moreover, if these records are at variance with his sworn deposition testimony, a jury and the Court are entitled to consider his capacity for truth under oath.

2. **Peterson Waived Any Objection to the Production of the Requested Medical Records.**

Plaintiff filed its Second Request for Production of Documents on September 22, 2005. Pursuant to FRCP Rule 34, and Rule 5(b)(2)(B) Defendant had thirty-three (33) days to respond which was Tuesday, October 25, 2005. Defendant untimely filed his objection October 26, 2005, stating merely that the requested medical records were not relevant.

If the responding party fails to make a timely objection, he has waived any and all of his objections. *See* Marx v. Kelly, Hart & Hallman, P.C., 929 F.2d 8 (1st Cir. 1991)(court dismissed complaint for failure to comply with discovery) *citing* Peat, Marwick, Mitchell & Co. v. The Honorable Lee R. West, 748 F.2d 540 (10th Cir. 1984)(court held claim of privilege not timely and refused to reverse trial court's order compelling discovery). Moreover, a bald faced assertion of a general objection is insufficient. Id. "The applicability of the privilege turns on the adequacy and timeliness of the showing [of privilege] as well as on the nature of the document." Peat, Marwick, 748 at 542.

Defendant's general objection was too little and too late. Accordingly, defendant has waived his objection to the production of his medical records.

3. **Peterson Waived Any Claim to Physician-Patient Privilege when He Commenced Actions For Emotional Distress.**

Peterson's counter-claim affirmatively placed his emotional condition squarely at issue in the case. Thus, he has waived any privilege of physician-patient confidentiality. *See* Rankin v. Liberty Mutual Ins. Co., (1st Cir. 1995) *citing* Nelson v. Lewis, 534 A.2d 720, 722 (Plaintiff waives right to physician-patient privilege as to formal discovery of

medical condition when he or she places the condition at issue); Lewis v. Roderick, 617 A.2d 119, 121 (R.I. 1992) (Court held that patient-physician privilege, codified in the Confidentiality of Health Care Information Act, R.I.G.L. §5-37.3-4, is *automatically* waived when a patient elects to put his medical condition at issue). Peterson mistakenly takes the position that merely withdrawing his claim for emotional distress takes his emotional condition out of issue, apparently thereby reviving his confidentially privilege. However, Peterson's medical condition remains "in issue," as evidenced by his deposition testimony.

Peterson testified in his deposition that commencing as early as 2002, ISM's intentional torts caused him psychological injury which disabled him to the point of becoming suicidal, caused weight loss of 25 pounds, and required him to submit to continuing psychiatric care. He further testified that due to ISM's harassing behavior, he took and/or takes three prescription medicines. (Peterson depo. at 48, 49, 70, 74, 76, 82).

To mount a defense and effectively prepare for trial, obviously ISM needs discovery from Peterson's treating physicians throughout the period of alleged disability, as his physicians would have unique firsthand knowledge and opinions about Peterson's condition. *See* Rankin v. Liberty Mutual Ins. Co., (1st Cir. 1995) *citing* Nelson v. Lewis, 534 A.2d 720. As noted by this Court in Bennett, *supra*, "mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Furthermore, there is nothing to prevent Peterson from attempting to reintroduce his emotional distress claims in the future, or from mentioning his medical condition at trial. Finally, ISM has the right to probe Peterson's credibility. Therefore, ISM's need for the discovery of the

relevant medical records outweighs any interest in confidentiality the defendant may have.

## CONCLUSION

For the foregoing reasons the Plaintiff requests this Court order the Defendant to produce his medical records within fifteen days.

INTERNATIONAL SOURCING &
MARKETING, LTD.,
By its Attorneys,

CATHERINE A. SAMMARTINO (#4762)
DANIELLE R. MENARD (#5821)
Sammartino & Berg LLP
Shakespeare Hall
128 Dorrance Street, Suite 400
Providence, RI 02903
(401) 274-0113 telephone
(401) 274-0175 facsimile

## CERTIFICATION

I hereby certify that on this 12 day of December, 2005, I caused to be submitted via facsimile and regular mail, postage prepaid, a copy of the within Memorandum in Opposition to the following counsel of record:

Armando E. Batastini, Esquire
Stephen J. MacGillivray, Esquire
Edwards & Angell LLP
2800 Financial Plaza
Providence, R.I. 02903

Allen J. Anderson, Esquire
FEES & BURGESS, P.C.
213 Green Street
Huntsville, AL 35801

Q And how many trips did you make?
A I don't recall.
Q Was it more than one?
A Yes.
Q And did you make those trips independently or with another ISM representative?
A Dave Peck went one time I think down there with me.
Q But do you recall making more than one trip?
A Yes.
Q And is it your recollection that on the remaining trips you were unaccompanied by other ISM representatives?
A Yes.
Q Any other claim to bonus entitlement?
A I would have to count it up and go back and check my records to make sure I had them all.
Q But in connection with your deposition today, did you engage in any review of those projects for which you claim a bonus entitlement?
A Yes, I did.
Q So is it fair to say that you're reasonably certain that you've given me all of them?
A No. One of the problems that I have is memory loss right now, short-term memory loss.

Q So there may be more?
A There may be more.
Q Is that your testimony?
A Yes.
Q And to what do you attribute your short-term memory loss?
A Stress.
Q How long have you been experiencing it?
A Two-and-a-half years, but. About two-and-a-half years.
Q And what triggered this stress that you've been experiencing?
A Initially it was the harassment on the job.
Q And when you say harassment, you're referring to the behavior that you testified to involving Mr. Palumbo?
A Yes. Along with -- along with another instance of, I thought about in Huntsville, Alabama, he threatened to fire me because I could not take him or know where to take him for prosecution services in Huntsville, Alabama.
Q And when was that?
A First quarter of 2004. So, he said, next time I come down, if you don't know where to take him, your

at that time I was not taking medicine.
Q Now, had you been taking medicine before you were prescribed Lexapro?
A Yes.
Q And when in time was that? Was that at the time you sought initial treatment?
A Yes.
Q So is it fair to say that that was 2003, early 2003?
A It might have been 2002, but I'm not positive.
Q And what particular incident, if any, prompted you to see Dr. Williams?
A Just the constant badgering and cussings and threats, things of that nature.
Q Who, if anyone, referred you to Dr. Deborah Williams?
A I don't recall who referred me.
Q But you do recall that someone referred you to her?
A I don't recall that.
Q Who's your general physician?
A It was a Dr. Coch, but he's moved out of the area, C-O-C-H.
Q And did another doctor assume responsibility for Dr. Coch's practice?
A Yes.

Q And what is your diagnosis?
A Depression.
Q Do you know what type of depression?
A No, I do not.
Q Do you have a history of depression in your family?
A Not that I'm aware of.
Q Do you recall whether or not you've been diagnosed with anxiety disorder?
A I don't recall.
Q Post-traumatic stress disorder?
A I don't recall.
Q Do you have medical treatment records with you today?
A Not with me, no.
Q But have you obtained your medical treatment records from Dr. Williams at this point in time?
A No, I haven't.
Q Has Dr. Williams recommended that you seek treatment besides your sessions with her?
A Yes.
Q And what does that treatment consist of?
A Therapy, counseling.
Q Okay. And are you doing that?
A Yes, I am.

A I don't know.
Q When you were terminated from your position with Pal Pilot, did you discuss with Mr. Niu or Mr. Sullivan what steps would be taken to further the work you had already done prior to your termination?
A I don't know if I understand that question.
Q Did they say anything about what they were going to do to further your efforts already made during the period August 2004 until January, 2005?
A No, I did not.
Q Did Mr. Sullivan indicate that he was going to make any follow-up initiatives?
A No, he did not.
Q Did Mr. Niu indicate that any follow-up work would be done?
A No, he did not.
Q Did either of those men speak to you about communicating with Rep One for the purpose of following through with what you had already begun on their behalf?
A No.
Q Did they mention Rep One at all?
A No.

Q Did they ask you to do anything?
A No.
Q On their behalf?
A No, they did not.
Q Did you hear from them at all prior to your contact, again, with Mr. Sullivan, after your termination from Pal Pilot?
A Yes, I did.
Q What happened?
A They called to see how I was doing because they knew the medical issues that I was having and they just called every now and then to check in on them.
Q Who called in to check in?
A Tim Sullivan.
Q Did anyone else follow through?
A No.
Q And that was during the period January through April?
A Yes. Well, yes.
Q Somewhere in that time period?
A Well, they terminated me in February, so.
Q Okay. Looking again at this sheet, the next page, I believe, which begins with "IR - Locknetics," going down to Nokia, did you have any contact with any of

A No.

Q Did he give you any information about anything involving Pal Pilot during that timeframe?

A No.

Q Was there anything else that was discussed during those conversations?

A Not business-related.

Q Did you speak with anyone else from Rep One besides Mr. Smith and Mr. Daniels during the period - Mark Smith and Ty Daniels - during the period February of '05 through April of '05?

A I think Steve Hatfield called me once or twice.

Q And is it your testimony it was for the purpose of seeing how you were doing?

A Yes.

Q And there was no discussion whatsoever about any business endeavors of Rep One or Pal Pilot?

A No.

Q When did you express to Ty Daniels during that period your interest in coming back to work with Pal Pilot, if at all?

THE WITNESS: When did I express my interest to Ty Daniels?

Q Did you at any time talk to Ty Daniels from February

of '05 through April of '05 about an interest in returning to work with or for Pal Pilot?
A Yes. He asked if I was going to go back. I said, if they're interested I definitely will.
Q And when was that?
A I don't recall the dates.
Q Was that during one of the calls where he would call to see how you were doing?
A Uh-hum.
Q So it's fair to say that there were other topics that came up?
A Yes. He asked me if I was going to go back to work if they offered. Friendship conversation.
Q Is there anything else that was discussed during those conversations?
A Not that I can recall.
Q Are there any other ISM customers not already discussed that you had contact with during the period of August of '04 through February of '05?
A Not that I can recall.
Q Are there any other ISM customers that we have not discussed that Rep One had contact with for Pal Pilot's benefit?
A Not that I know of.